**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

                                                          **Jury Trial Demand**

       Plaintiffs,

vs.

NEW MEDICAL GROUP, INC., LEDIA
ZAPATA, and LUIS FELIPE VERDECIA,
M.D.,

       Defendants.

_____/

## COMPLAINT

       Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs"), sue

Defendants and allege as follows:

       1.     This action seeks to recover more than $2,350,000.00 that Defendants wrongfully

obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault",

"personal injury protection", or "PIP") insurance charges through Defendant New Medical Group,

Inc. ("New Medical") relating to medically unnecessary, illusory, unlawful, and otherwise non-

reimbursable health care services and goods, including purported examinations, physical therapy

services, and chiropractic services (collectively the "Fraudulent Services"), that purportedly were

provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000 in pending fraudulent and unlawful PIP claims that Defendants have submitted through New Medical because:

(i)      at all relevant times, Defendants operated New Medical in violation of Florida law, including the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"), and Florida's Physical Therapy Practice Act, Flat. Stat. §§ 486.011-486.172 (the "Physical Therapy Act").

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were performed – to the extent that they were performed at all – by massage therapists, and Florida law prohibits PIP insurance reimbursement for massage or for services provided by massage therapists;

(iv)     in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services;

(v)      the billing submitted through New Medical was submitted in violation of the billing requirements set forth in Florida's Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law");

(vi)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3.      As set forth below, Defendants at all relevant times have known that:

(i)      Defendants operated in violation of Florida law, including the Clinic Act, the False and Fraudulent Insurance Claims Statute, the Physical Therapy Act, and therefore, ineligible for PIP reimbursement,

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were performed – to the extent that they were performed at all – by massage therapists, and were, therefore, ineligible for PIP reimbursement;

(iv)    in many cases, the Fraudulent Services were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services, and were, therefore, ineligible for PIP reimbursement;

(v)     in many cases, the billing submitted through New Medical was submitted in violation of the billing requirements set forth in the No-Fault Law, rendering the charges ineligible for PIP reimbursement;

(vi)    in many cases, the Fraudulent Services never were provided in the first instance; and

(vii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

4.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through New Medical.

5.      The chart annexed hereto as Exhibit "1" set forth a large, representative sample of the fraudulent and unlawful claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO.

6.      Defendants' fraudulent and unlawful scheme began no later than 2019 and has continued uninterrupted since that time. As a result of Defendants' fraudulent and unlawful scheme, GEICO has incurred damages of more than $2,350,000.

## THE PARTIES

### I.      Plaintiffs

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.     Defendants

8.      Defendant New Medical Group ("New Medical") is a Florida corporation with its principal place of business in Doral, Florida.

9.      New Medical was incorporated on or about February 10, 1996, has had Zapata as its president and owner between March 2012 and the present, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

10.     Defendant Ledia Zapata ("Zapata") resides in and is a citizen of Florida. Zapata owned and controlled New Medical, and used New Medical as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

11.     Defendant Luis Felipe Verdecia, M.D. ("Verdecia") resides in and is a citizen of Florida. Verdecia was licensed to practice medicine in Florida on or about October 31, 2000. At all relevant times, Verdecia falsely purported to actually perform the required duties of a health care clinic medical director at New Medical, and used New Medical as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

### III.    Anthony Gallo, D.C.

12.    Although GEICO has not named him as a Defendant in this action, Anthony Gallo, D.C. is also relevant to understanding Defendants' fraudulent and unlawful scheme and the claims that Plaintiffs assert in this case.

13.    Gallo resides in and is a citizen of Florida. Gallo was licensed to practice chiropractic on or about July 10, 2006. Gallo purported to perform or directly supervise the substantial majority of the Fraudulent Services that were billed through New Medical to GEICO.

**JURISDICTION AND VENUE**

14.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interests and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

15.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

16.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

17.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.    Overview of Pertinent Law Governing PIP Insurance Reimbursement

18.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to Insureds.

19.    Under the No-Fault Law, an Insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

20.    In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

21.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

22.    Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

23.    Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and

6

which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

24.     Pursuant to the Clinic Act, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration ("AHCA"), and appoint a physician as medical director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

25.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

26.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

27.     Moreover, a clinic medical director must serve as the records owner for the clinic, and – in that capacity – must, among other things: (i) develop and implement policies, standards, and procedures to protect the confidentiality and security of patient records at the clinic; (ii) ensure that clinic employees are trained in such policies, standards, and procedures; and (iii) be responsible for maintaining a  record of all disclosures of information contained in clinic patients' medical records to third parties, including the purpose of the disclosure requests.

28.     Furthermore, pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

29.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is

otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

30.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

31.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients.

32.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

33.     Further, pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. At the same time, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

34.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)     in accordance with generally accepted standards of medical practice;

(b)     clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)     not primarily for the convenience of the patient, physician, or other health care provider.

8

35.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

36.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

37.     Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

38.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

39.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

40.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as

the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

41.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

42.     To "directly supervise" a service, a health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26: Completing and Processing Form CMS-1500 Data Set.

43.     Pursuant to the No-Fault Law, insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual licensed health care practitioners who performed or directly supervised the underlying services.

## II.     The Defendants' Fraudulent and Unlawful Scheme

44.     Beginning in at least 2019, and continuing through the present day, the Defendants devised and implemented a fraudulent and unlawful scheme pursuant to which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services.

## A.     The Defendants' Violations of the Clinic Act

55.     Because New Medical is a health care clinic subject to the Clinic Act, Zapata could not operate New Medical unless she obtained a clinic license for New Medical, and unless New

Medical employed a licensed physician as its medical director, who actually performed the required duties of a clinic medical director.

56.     However, if Zapata retained a legitimate physician to serve as New Medical's medical director, any such legitimate physician actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the Defendants' fraudulent and unlawful scheme.

57.     Accordingly, Zapata recruited Verdecia, a licensed physician, who was willing to falsely pose as the legitimate medical director at New Medical, but who – in actuality – did not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic.

58.     Verdecia was never a genuine medical director for New Medical.

59.     Instead, from the beginning of Verdecia's association with New Medical, he ceded all day-to-day decision-making and oversight regarding health care services at New Medical to Zapata.

60.     In keeping with the fact that Verdecia was never the genuine medical director at New Medical, Verdecia never legitimately conducted systematic review of New Medical's billing to ensure that the billing was not fraudulent or unlawful, never ensured that all health care practitioners at New Medical had active appropriate certification or licensure for the level of care being provided, never legitimately served as records owner at New Medical, and instead permitted New Medical to operate in the fraudulent and unlawful manner described herein.

61.     What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician medical director, Verdecia never provided legitimate, day-to-day supervision at New Medical, and – in fact – was only occasionally present at New Medical, if at all.

11

62.     For instance, New Medical's 2024 clinic licensing applications, which were submitted under penalties of perjury, represented that Verdecia was only present at New Medical eight hours per month.

63.     In the claims identified in Exhibit "1", Defendants falsely represented that New Medical was in compliance with the Clinic Act and eligible to receive PIP reimbursement.

64.     In fact, New Medical was not in compliance with the Clinic Act, and thus was not eligible to receive PIP reimbursement.

**B.      The Fraudulent and Unlawful Billing for Physical Therapy Services Performed by Massage Therapists at New Medical**

65.     Defendants billed GEICO for purported "physical therapy" services provided to GEICO Insureds at New Medical.

66.     As set forth in Exhibit "1", the purported "physical therapy" services constituted the substantial majority of the services that Defendants billed through New Medical to GEICO.

67.     In the claims for "physical therapy" services identified in Exhibit "1", the services unlawfully were performed – to the extent that they were performed at all – by massage therapists, including individuals named Jaclyn Cabrera, L.M.T. ("Cabrera"), Luis Misael Castro, L.M.T. ("Castro"), and Ramon Senciales Lobaina, L.M.T. ("Senciales").

68.     Defendants were aware of the fact that New Medical could not legally recover PIP Benefits for any services performed by massage therapists.

69.     As a result, and in order to conceal the fact that Cabrera, Castro, Senciales, and other massage therapists performed the purported "physical therapy" services that were unlawfully billed through New Medical to GEICO, Defendants omitted any reference to Cabrera, Castro, Senciales, and other massage therapists associated with New Medical on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

12

70.     Instead, in the claims for physical therapy services identified in Exhibit "1",
Defendants routinely falsely listed Gallo on the HCFA-1500 forms as the supposed provider or
direct supervisor of the physical therapy services.

71.     In fact, Gallo did not perform or directly supervise the physical therapy services
that were billed through New Medical to GEICO, and could not have performed or directly
supervised the services.

72.     In keeping with the fact that Gallo did not perform or directly supervise the physical
therapy services that were billed through New Medical to GEICO, Defendants often represented
in their billing that Gallo had performed or directly supervised a non-credible volume of services
on individual dates. For example:

(i)      On February 12, 2020, Defendants billed GEICO for more than 17 hours of services
         provided to 12 different Insureds, and falsely represented in the billing that Gallo
         had performed or at least directly supervised all of them.

(ii)     On October 6, 2021, Defendants billed GEICO for more than 18 hours of services
         provided to 12 different Insureds, and falsely represented in the billing that Gallo
         had performed or at least directly supervised all of them.

(iii)    On August 11, 2021, Defendants billed GEICO for more than 20 hours of services
         provided to 14 different Insureds, and falsely represented in the billing that Gallo
         had performed or at least directly supervised all of them.

(iv)     On November 29, 2021, Defendants billed GEICO for more than 18 hours of
         services provided to 12 different Insureds, and falsely represented in the billing that
         Gallo had performed or at least directly supervised all of them.

(v)      On April 25, 2022, Defendants billed GEICO for more than 19 hours of services
         provided to 14 different Insureds, and falsely represented in the billing that Gallo
         had performed or at least directly supervised all of them.

(vi)     On May 11, 2022, Defendants billed GEICO for more than 27 hours of services
         provided to 18 different Insureds, and falsely represented in the billing that Gallo
         had performed or at least directly supervised all of them.

(vii)  On June 10, 2022, Defendants billed GEICO for more than 17 hours of services provided to 10 different Insureds, and falsely represented in the billing that Gallo had performed or at least directly supervised all of them.

(viii)  On October 10, 2022, Defendants billed GEICO for more than 17 hours of services provided to 12 different Insureds, and falsely represented in the billing that Gallo had performed or at least directly supervised all of them.

(ix)  On May 17, 2023, Defendants billed GEICO for more than 21 hours of services provided to 16 different Insureds, and falsely represented in the billing that Gallo had performed or at least directly supervised all of them.

(x)  March 27, 2024, Defendants billed GEICO for more than 20 hours of services provided to 12 different Insureds, and falsely represented in the billing that Gallo had performed or at least directly supervised all of them.

73.  These are only representative examples. In the claims that are identified in Exhibit "1", Defendants routinely falsely that Gallo had performed – or at least directly supervised – a non-credible volume of services on individual dates.

74.  Furthermore, upon information and belief, the fraudulent and unlawful billing for physical therapy services that Defendants submitted through New Medical to GEICO constituted only a fraction of the total fraudulent and unlawful billing for physical therapy services that Defendants submitted through New Medical to all of the automobile insurers in the Florida automobile insurance market.

75.  GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

76.  It is extremely improbable, to the point of impossibility, that Defendants only submitted fraudulent and unlawful billing to GEICO, and that Defendants did not simultaneously bill other automobile insurers.

77.  Thus, upon information and belief, the non-credible volume of services that Gallo purported to perform or directly supervise for GEICO Insureds at New Medical on individual dates

of service, including but not limited the dates of service identified above, constituted only a fraction of the total volume of services that Gallo purported to perform or directly supervise at New Medical, including to individuals insured by companies other than GEICO, on those same dates of service.

78.     In the claims for "physical therapy" services identified in Exhibit "1", Defendants falsely represented that New Medical was entitled to PIP reimbursement for the services, when in fact it was not because the services had been performed by massage therapists.

79.     In the claims for the putative physical therapy services identified in Exhibit "1", Defendants routinely misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent they were performed at all – by massage therapists, in contravention of Florida law;

(ii)    New Medical could not lawfully recover PIP Benefits for the purported physical therapy services, because they were performed by massage therapists; and

(iv)    Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

## C.     The Defendants' Unlawful General Business Practice of Failing to Make a Good Faith Effort to Collect Deductibles from Their Patients

80.     Moreover, during the relevant time period, Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

81.     In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted to GEICO through New Medical for Defendants' Fraudulent Services, Defendants represented that they did not collect any money, whether it be a copayment or deductible, from the patients.

82.     In the claims identified in Exhibit "1", Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in the fact they were neither lawfully provided nor reimbursable because Defendants engaged in the unlawful general business practice of waiving, or failing to make a good-faith effort to collect, and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

83.     In the context, Verdecia – who at all relevant times purported to be the medical director at New Medical – did not, and could not have, legitimately systematically reviewed New Medical's billings to ensure that they were neither fraudulent nor unlawful.

84.     Had Verdecia legitimately systematically reviewed New Medical's billings to ensure that they were neither fraudulent nor unlawful, he would have noted – among other things – that New Medical unlawfully engaged in the general business practice of waiving, or failing to make a good faith effort to collect, deductibles from its patients in violation of the False and Fraudulent Insurance Claims Statute, and he would have taken immediate corrective action.

**D.      The Defendants' Fraudulent Treatment and Billing Protocol**

85.     In the claims identified in Exhibit "1", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

86.     Even so, in the claims identified in Exhibit "1", Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment the Insureds who purportedly were subjected to the "treatment".

87.     Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds in the claims identified in Exhibit "1" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

88.     Each step in Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit Defendants to generate and falsely justify the maximum amount of fraudulent PIP Billing for each Insured.

89.     No legitimate physician, health care provider, or clinic would permit the fraudulent treatment and billing protocols described below to proceed under their auspices.

90.     Defendants permitted the fraudulent treatment and billing protocol designed below to proceed under their auspices because they sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.     The Fraudulent Charges for Initial Examinations at New Medical**

91.     As an initial step in Defendants' fraudulent treatment and billing protocol, Defendants purported to provide virtually every Insured in the claims identified in Exhibit "1" with an initial examination.

92.     Gallo purported to personally perform the substantial majority of the initial examinations in the claims identified in Exhibit "1", at Defendants' direction.

93.     In the claims identified in Exhibit "1", the purported initial examinations at New Medical were then billed by Defendants to GEICO under CPT code 99203, typically resulting in charges of $325.00 for each purported examination that they purported to provide.

94.     In the claims for initial examinations identified in Exhibits "1", the charges for the initial examinations were fraudulent in that they misrepresented New Medical's eligibility to collect PIP Benefits in the first instance.

95.     In fact, and as set forth herein, New Medical never was eligible to collect PIP Benefits, inasmuch as it operated in violation of Florida law.

96.     As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

97.     In the claims for initial examinations identified in Exhibit "1", Defendants routinely misrepresented the severity of the Insureds' presenting problems.

98.     As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

99.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

100.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically represents that the insured presented with problems of moderate severity.

101.    The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)      Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

102.   Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

103.   However, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as a result of their typically minor automobile accidents, the problems virtually always were minimal severity soft tissue injuries such as sprains and strains.

104.   For instance, in most of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as a result of their accident, and to the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue diagnosis.

105.   Furthermore, in most of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

19

106.     Even so, in the claims for initial examinations identified in Exhibit "1", Defendants billed for examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

107.     For example:

(i)      On February 6, 2019, an Insured named MW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MW's vehicle was drivable following the accident. The police report further indicated that MW was not injured and did not complain of any pain at the scene. In keeping with the fact that MW was not seriously injured, MW did not visit any hospital emergency room following the accident. To the extent that MW experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MW by Gallo on February 6, 2019, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)     On February 9, 2019, an Insured named CG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CG's vehicle was drivable following the accident. The police report further indicated that CG was not injured and did not complain of any pain at the scene. In keeping with the fact that CG was not seriously injured, CG did not visit any hospital emergency room following the accident. To the extent that CG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CG by Gallo on February 18, 2019, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)    On February 13, 2020, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AS by Gallo on February 14, 2020, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)     On December 11, 2020, an Insured named MQ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MQ's vehicle was drivable following the accident. The police report further indicated that MQ was not injured and did not complain of any pain at the scene. In keeping with the fact that MQ was not seriously injured, MQ did not visit any hospital emergency room following the accident. To the extent that MQ experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MQ by Gallo on February 11, 2021, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)      On August 3, 2021, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MB by Gallo on August 5, 2021, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)     On October 18, 2021, an Insured named GG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GG's vehicle was drivable following the accident. The police report further indicated that GG was not injured and did not complain of any pain at the scene. In keeping with the fact that GG was not seriously injured, GG did not visit any hospital emergency room following the accident. To the extent that GG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of GG by Gallo on February 10, 2022, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)    On October 20, 2021, an Insured named OC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OC's vehicle was drivable following the accident. The police report further indicated that OC was not injured and did not complain of any pain at the scene. In keeping with the fact that OC was not seriously injured, OC did not visit any hospital emergency room following the accident. To the extent that OC experienced any health problems at all as a result of the accident,

they were of low or minimal severity. Even so, following a purported initial examination of OC by Gallo on October 24, 2021, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)   On April 20, 2022, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain at the scene. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of TS by Gallo on April 25, 2022, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)   On February 17, 2023, an Insured named AF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AF's vehicle was drivable following the accident. The police report further indicated that AF was not injured and did not complain of any pain at the scene. In keeping with the fact that AF was not seriously injured, AF did not visit any hospital emergency room following the accident. To the extent that AF experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AF by Gallo on February 21, 2023, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x)   On April 4, 2023, an Insured named CP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CP's vehicle was drivable following the accident. The police report further indicated that CP was not injured and did not complain of any pain at the scene. In keeping with the fact that CP was not seriously injured, CP did not visit any hospital emergency room following the accident. To the extent that CP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CP by Gallo on April 5, 2023, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xi)   On April 28, 2023, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MV's vehicle was drivable following the accident.

The police report further indicated that MV was not injured and did not complain of any pain at the scene. In keeping with the fact MV was not seriously injured, MV did not visit any hospital emergency room following the accident. To the extent that MV experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MV by Gallo on May 8, 2023, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xii)    On August 16, 2023, an Insured named BR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BR's vehicle was drivable following the accident. The police report further indicated that BR was not injured and did not complain of any pain at the scene. In keeping with the fact BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of BR by Gallo on August 22, 2023, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiii)    On September 18, 2023, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, JD did not visit any hospital emergency room following the accident. To the extent that JD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JD by Gallo on September 20, 2023, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiv)    On June 28, 2024, an Insured named PH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PH's vehicle was drivable following the accident. The police report further indicated that PH was not injured and did not complain of any pain at the scene. In keeping with the fact that PH was not seriously injured, PH did not visit any hospital emergency room following the accident. To the extent that PH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of PH by Gallo on July 1, 2024, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xv)   On March 3, 2025, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured and did not complain of any pain at the scene. In keeping with the fact that JV was not seriously injured, JV did not visit any hospital emergency room following the accident. To the extent that JV experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JV by Gallo on March 5, 2024, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

108.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Defendants routinely falsely represented that the Insureds presented with problems of moderate severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that Defendants purported to provide the Insureds.

**b.     Misrepresentations Regarding the Amount of Time Spent on Initial Examinations**

109.   What is more, in the claims identified in Exhibit "1", the charges for initial examinations under CPT code 99203 misrepresented and exaggerated the amount of time that the examining practitioners spent performing the examinations.

110.   Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 30 minutes performing the examination.

111.   As set forth in Exhibits "1", Defendants typically billed the purported initial-up examinations to GEICO through New Medical under CPT code 99203, and thereby represented

that the physicians, chiropractors, or other health care practitioners who purported to conduct the examinations – typically Gallo – spent at least 30 minutes performing the examinations.

112.    In fact, in the initial examinations identified in Exhibit "1", the health care practitioners who purported to perform the initial examinations on behalf of New Medical – usually Gallo – never spent more than 15 minutes of time when performing the examinations, much less 30 minutes.

113.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 15 minutes of time to perform, the examining health care practitioners used template forms in purporting to conduct the examinations.

114.    All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

115.    These interviews and examinations did not require Gallo or any other examining health care practitioner associated with New Medical to spend more than 15 minutes of time on the examinations.

116.    In the claims for initial examinations that are identified in Exhibit "1", Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that take less time to perform.

c.      **Misrepresentations Regarding the Extent of Medical Decision-Making**

117.    Furthermore, and pursuant to the CPT Assistant, when Defendants billed GEICO for putative initial examinations under CPT code 99203 in the claims for initial examinations identified in Exhibit "1", they falsely represented that the practitioners who purported to perform

the examinations on behalf of New Medical – typically Gallo – engaged  in some legitimate, low complexity medical decision-making in connection with the examinations.

118.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

119.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

120.    For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things: (i) involve review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) there typically must be at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

121.    In actuality, the Defendants' purported initial examinations did not involve any legitimate medical decision-making at all.

122.    Rather, in the claims for initial examinations identified in Exhibit "1": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant

26

complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the practitioners who purported to perform the examinations did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for every Insureds, regardless of their true individual circumstances or presentation.

123.    For example:

(i)      On December 7, 2019, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ER's vehicle was drivable following the accident. The police report further indicated that ER was not injured and did not complain of any pain at the scene. In keeping with the fact that ER was not seriously injured, ER did not visit any hospital emergency room following the accident. To the extent that ER experienced any health problems at all as a result of the accident, they were of low or minimal severity. On December 16, 2019, Gallo purported to conduct an initial examination of ER at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided ER with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ER's presenting problems, nor the treatment plan provided to ER by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, ER did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to ER. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On March 16, 2020, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JO's vehicle was drivable following the accident. The police report further indicated that JO was not injured and did not complain of

any pain at the scene. In keeping with the fact that JO was not seriously injured, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as a result of the accident, they were of low or minimal severity. On March 18, 2020, Gallo purported to conduct an initial examination of JO at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided JO with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JO's presenting problems, nor the treatment plan provided to JO by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, JO did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to JO. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)     On October 29, 2020, an Insured named EZ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EZ's vehicle was drivable following the accident. The police report further indicated that EZ was not injured and did not complain of any pain at the scene. In keeping with the fact that EZ was not seriously injured, EZ did not visit any hospital emergency room following the accident. To the extent that EZ experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 4, 2020, Gallo purported to conduct an initial examination of EZ at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided EZ with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EZ's presenting problems, nor the treatment plan provided to EZ by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, EZ did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to EZ. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo

engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)     On September 10, 2021, an Insured named PG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PG's vehicle was drivable following the accident. The police report further indicated that PG was not injured and did not complain of any pain at the scene. In keeping with the fact that PG was not seriously injured, PG did not visit any hospital emergency room following the accident. To the extent that PG experienced any health problems at all as a result of the accident, they were of low or minimal severity. On September 13, 2021, Gallo purported to conduct an initial examination of PG at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided PG with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PG's presenting problems, nor the treatment plan provided to PG by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, PG did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to PG. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On September 17, 2021, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of low or minimal severity. On September 22, 2021, Gallo purported to conduct an initial examination of AM at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided AM with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by New Medical, Zapata,

Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to AM. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)   On April 11, 2022, an Insured named BR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BR's vehicle was drivable following the accident. The police report further indicated that BR was not injured and did not complain of any pain at the scene. In keeping with the fact that BR was not seriously injured, BR did not visit any hospital emergency room following the accident. To the extent that BR experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 11, 2022, Gallo purported to conduct an initial examination of BR at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided BR with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BS's presenting problems, nor the treatment plan provided to BR by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, BR did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to BR. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On April 20, 2022, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain at the scene. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 25, 2022, Gallo purported to conduct an initial examination of TS at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in

connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided TS with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TS's presenting problems, nor the treatment plan provided to TS by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, TS did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to TS. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On February 28, 2023, an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DB's vehicle was drivable following the accident. The police report further indicated that DB was not injured and did not complain of any pain at the scene. In keeping with the fact that DB was not seriously injured, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as a result of the accident, they were of low or minimal severity. On February 28, 2023, Gallo purported to conduct an initial examination of DB at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided DB with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DB's presenting problems, nor the treatment plan provided to DB by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, DB did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to DB. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)   On April 19, 2023, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured and did not complain of any pain at the scene. In keeping with the fact that RG was not seriously injured,

31

RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 20, 2023, Gallo purported to conduct an initial examination of RG at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided RG with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RG's presenting problems, nor the treatment plan provided to RG by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, RG did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to RG. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)     On November 27, 2023, an Insured named JT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JT's vehicle was drivable following the accident. The police report further indicated that JT was not injured and did not complain of any pain at the scene. In keeping with the fact that JT was not seriously injured, JT did not visit any hospital emergency room following the accident. To the extent that JT experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 28, 2023, Gallo purported to conduct an initial examination of JT at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided JT with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JT's presenting problems, nor the treatment plan provided to JT by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, JT did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to JT. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)     On December 11, 2023, an Insured named GA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GA's vehicle was drivable following the accident. The police report further indicated that GA was not injured and did not complain of any pain at the scene. In keeping with the fact that GA was not seriously injured, GA did not visit any hospital emergency room following the accident. To the extent that GA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On December 23, 2023, Gallo purported to conduct an initial examination of GA at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided GA with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GA's presenting problems, nor the treatment plan provided to GA by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, GA did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to GA. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)    On January 15, 2024, an Insured named GA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GA's vehicle was drivable following the accident. The police report further indicated that GA was not injured and did not complain of any pain at the scene. In keeping with the fact that GA was not seriously injured, GA did not visit any hospital emergency room following the accident. To the extent that GA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 17, 2024, Gallo purported to conduct an initial examination of GA at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided GA with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GA's presenting problems, nor the treatment plan provided to GA by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, GA did not need any significant treatment at all as a result of the accident,

33

and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to GA. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)   On May 28, 2024, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured and did not complain of any pain at the scene. In keeping with the fact that CS was not seriously injured, CS did not visit any hospital emergency room following the accident. To the extent that CS experienced any health problems at all as a result of the accident, they were of low or minimal severity. On May 31, 2024, Gallo purported to conduct an initial examination of CS at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided CS with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CS's presenting problems, nor the treatment plan provided to CS by New World Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, CS did not need any significant treatment at all as a result of the accident, and the treatment provided by New World Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to CS. Even so, New World Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)   On June 24, 2024, an Insured named CD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CD's vehicle was drivable following the accident. The police report further indicated that CD was not injured and did not complain of any pain at the scene. In keeping with the fact that CD was not seriously injured, CD did not visit any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 25, 2024, Gallo purported to conduct an initial examination of CD at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination.

Instead, Gallo - at Defendants' direction - provided CD with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CD's presenting problems, nor the treatment plan provided to CD by New World Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, CD did not need any significant treatment at all as a result of the accident, and the treatment provided by New World Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to CD. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)     On January 17, 2025, an Insured named FS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FS's vehicle was drivable following the accident. The police report further indicated that FS was not injured and did not complain of any pain at the scene. In keeping with the fact that FS was not seriously injured, FS did not visit any hospital emergency room following the accident. To the extent that FS experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 23, 2025, Gallo purported to conduct an initial examination of FS at New Medical. To the extent that Gallo performed the examination in the first instance, Gallo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gallo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gallo - at Defendants' direction - provided FS with the same, false list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither FS's presenting problems, nor the treatment plan provided to FS by New Medical, Zapata, Verdecia, and Gallo presented any risk of significant complications, morbidity, or mortality. To the contrary, FS did not need any significant treatment at all as a result of the accident, and the treatment provided by New Medical, Zapata, Verdecia, and Gallo consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to FS. Even so, New Medical, Zapata, and Verdecia billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gallo engaged in some legitimate, low complexity medical decision-making during the purported examination.

124.     These are only representative examples. In the claims identified in Exhibit "1", Defendants routinely falsely represented that the purported examinations involved legitimate low complexity medical decision-making, when in fact they did not involve any legitimate medical decision-making at all and were instead designed to create a false justification for the other

Fraudulent Services that the Defendants purported to provide to the Insureds.

125.    In a legitimate clinic setting, when a patient presents with a soft tissue injury such as sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

126.    It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

127.    Even so, in the claims identified in Exhibit "1", Defendants routinely caused Insureds to immediately begin a course of medically unnecessary physical therapy often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

128.    The Defendants routinely caused Insureds to immediately begin a course of physical therapy often within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making, and had pre-determined outcomes.

129.    There are a substantial number of vehicles that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

130.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured and in a given automobile accident.

131.    As set forth herein, in the claims identified in Exhibit "1", almost all of the Insureds that Defendants purported to treat were involved in relatively minor accidents.

132.    It is improbable that any two or more Insureds involved in any one of the minor accidents in the claims identified in Exhibit "1", would suffer substantially similar injuries as a result of their accidents, or require a substantially similar course of treatment.

133.    It is even more improbable – to the point of impossibility – that this kind of pattern would recur with great frequency within the cohort of patients treating at an individual health care clinic such as New Medical, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

134.    Even so, in keeping with the fact that Defendants' putative "diagnoses" were pre-determined and false, Defendants frequently purported to provide examinations – on or about the same date – to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially identical, false "diagnoses", and recommended substantially identical courses of medically unnecessary "treatment", despite the fact that they were differently situated.

135.    For example:

(i)    On December 14, 2019, two Insureds – GR and AG – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, December 16, 2019. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided GR and AG with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii)    On August 28, 2020, two Insureds – CL and GG – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, September 23, 2020. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided CL and GG with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

37

(iii)     On January 30, 2021, two Insureds – EF and JN – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, February 19, 2021. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided EF and JN with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv)     On April 19, 2021, two Insureds – AD and ED – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, May 10, 2021. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided AD and ED with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v)      On May 20, 2021, two Insureds – LS and CE – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, June 16, 2021. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided LS and CE with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi)     On July 30, 2021, three Insureds – WC, SZ, and GZ – were involved in the same automobile accident. Thereafter, all three Insureds presented at New Medical for an initial examination by Gallo on the exact same date, August 10, 2021. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided WC, SZ, and GZ with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vii)    On October 28, 2021, two Insureds – MQ and JQ – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, November 15, 2021. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided MQ and JQ with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)   On November 21, 2021, two Insureds – KH and GC – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, January 3, 2022. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided KH and GC with substantially similar,

false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix) On April 20, 2022, two Insureds – MP and TS – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, May 6, 2022. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided provided MP and TS with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(x) On June 28, 2022, two Insureds – BG and JM – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for initial examinations by Gallo on the exact same date, July 1, 2022. At the conclusion of the purported initial examinations, New Medical and Gallo provided BG and JM with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xi) On August 15, 2022, two Insureds – BQ and LC – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for initial examinations by Gallo on the exact same date, August 19, 2022. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided BQ and LC with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xii) On March 19, 2023, three Insureds – XS, AF and MO – were involved in the same automobile accident. Thereafter, all three Insureds presented at New Medical for an initial examination by Gallo on the exact same date, April 3, 2023. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided XS, AF and MO with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xiii) On June 9, 2023, two Insureds – RM and KG – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, June 19, 2023. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided RM and KG with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiv) On August 16, 2023, two Insureds – AR and BR – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, August 28, 2023. At the conclusion of the purported initial examinations, Gallo – at the direction of New

Medical, Zapata, and Verdecia – provided AR and BR with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xv)     On March 16, 2024, two Insureds – MV and MM – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, April 9, 2024. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided provided MV and MM with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xvi)    On June 28, 2024, two Insureds – AS and PH – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, July 1, 2024. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided AS and PH with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xvii)   On September 7, 2024, two Insureds – GT and DT – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for initial examinations by Gallo, on the exact same date, September 9, 2024. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided DT and GT with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xviii)  On September 14, 2024, two Insureds – MM and JD – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, September 30, 2024. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided provided MM and JD with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xix)    On September 19, 2024, two Insureds – AJ and AJ – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an initial examination by Gallo on the exact same date, September 20, 2024. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided AJ and AJ with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xx)     On February 14, 2025, two Insureds – RC and LH – were involved in the same automobile accident. Thereafter, both Insureds presented at New Medical for an

initial examination by Gallo on the exact same date, February 15, 2025. At the conclusion of the purported initial examinations, Gallo – at the direction of New Medical, Zapata, and Verdecia – provided RC and LH with substantially similar, false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

136.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Defendants frequently issued substantially similar "diagnoses" – on or about the same date – to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that each of the Insureds was differently situated and, in any case, did not require the treatment.

137.    In the claims for initial examinations identified in Exhibit "1", Defendants routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

138.    In actuality, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the laundry list of other Fraudulent Services that Defendants purported to provide.

139.    In the claims for initial examinations identified in Exhibit "1", Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii) New Medical was never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinic was unlawfully operated in violation of Florida law.

**2.      The Fraudulent Charges for Follow-Up Examinations at New Medical**

140.    In addition to their fraudulent initial examinations, Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibits "1" to one or more fraudulent follow-up examinations during the course of their fraudulent and billing protocol.

141.    Gallo purported to personally perform the substantial majority of the follow-up examinations in the claims identified in Exhibit "1".

142.    As set forth in Exhibit "1", Defendants then typically billed the purported follow-up examinations through New Medical to GEICO under CPT code 99213, virtually always resulting in a charge of between $158.34 and $198.30 for each putative follow-up examination.

143.    In the claims for follow-up examinations identified in Exhibit "1", the charges for follow-up examinations were fraudulent in that they misrepresented New Medical's eligibility to collect PIP Benefits in the first instance.

144.    In fact, and set forth herein, New Medical was never eligible to collect PIP Benefits, inasmuch as the clinic was operated unlawfully in violation of Florida law.

145.    As set forth below, Defendants' charges for the follow-up examinations identified in Exhibit "1" were also fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

146.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

42

147.    To the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

148.    Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "1" presented for their putative follow-up examinations – typically months or weeks after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

149.    Even so, in the claims for the follow-up examinations identified in Exhibit "1", Defendants falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

150.    In the claims for follow-up examinations identified in Exhibit "1", Defendants routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99213, because examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

151.    What is more, in the claims for follow-up examinations identified in Exhibit "1", neither Gallo, nor any other chiropractor or other health care practitioner associated with New

Medical, ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

152.    Rather, the examining practitioners at New Medical, at the Defendants' direction, simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examination; and either (ii) referred the Insureds for even more medically unnecessary physical therapy and chiropractic services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

153.    The purported "follow-up examinations" that Defendants purported to provide to the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into New Medical's office.

154.    In the claims for follow-up examinations identified in Exhibit "1", Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   New Medical was never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinic was unlawfully operated in violation of Florida law.

3.      **The Fraudulent and Unlawful Charges for Extracorporeal Shockwave Therapy**

155.    Based upon the false, boilerplate "diagnoses" that Defendants provided during the initial and follow-up examinations, Defendants also purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more sessions of extracorporeal shockwave therapy ("ESWT") during the course of their fraudulent treatment protocol.

156.    Typically, Gallo purported to perform the ESWT at New Medical, which was then billed to GEICO through New Medical under CPT code 0101T, virtually always resulting in a charge of $495.00 for each ESWT treatment that supposedly was provided.

157.    Like the charges for the other Fraudulent Services, the charges for ESWT were fraudulent in that the ESWT was medically unnecessary and was provided – to the extent that it was provided at all – pursuant to false, boilerplate "diagnoses" that Defendants provided during their fraudulent examinations.

158.    In keeping with the fact that Defendants' ESWT "treatments" were medically unnecessary: (i) ESWT has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) Palmetto, a contractor for the Centers for Medicare and Medicaid Services ("CMS"), has published coverage guidance stating that ESWT is neither reasonable nor necessary for the treatment of musculoskeletal conditions; and (iii) there is no legitimate peer-reviewed data that establishes the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

159.    Even so, Defendants purported to provide medically unnecessary ESWT to many Insureds pursuant to their pre-determined fraudulent treatment protocol without regard to each Insured's individual complaints, symptoms, or presentation.

160.    For example:

(i)     On or about February 15, 2023, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named MR.

(ii)    On or about March 28, 2023, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named DB.

(iii)   On or about May 4, 2023, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named ST.

(iv)   On or about June 12, 2023, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named LM.

(v)    On August 2, 2023, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named JD.

(xvi)  On or about October 23, 2023, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named FS.

(xvii) On or about December 12, 2023, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named JG.

(xviii) On or about January 22, 2024, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named EM.

(xix)  On or about February 9, 2024, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named AA.

(xx)   On or about March 25, 2024, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named CJ.

(xxi)  On or about April 26, 2024, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named PA.

(xxii) On or about August 7, 2024, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named MA.

(xxiii) On or about December 2, 2024, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named AV.

(xxiv) On or about February 19, 2025, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named LH.

(xxv) On or about March 31, 2025, Defendants billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to an Insured named RJ.

161.    These are only representative examples. In the claims for ESWT identified in Exhibit "1", Defendants routinely billed GEICO for medically unnecessary ESWT that was purportedly provided through New Medical to Insureds.

**4.    The Fraudulent and Unlawful Charges for Chiropractic and Physical Therapy Services at New Medical**

162.    In addition to the fraudulent initial examinations and follow-up examinations, and ESWT, Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to extensive, medically unnecessary physical therapy and chiropractic treatment.

163.    Specifically, Defendants caused virtually every Insured to receive two to five months of chiropractic and physical therapy services.

164.    In addition, Defendants caused virtually every Insured to receive substantially similar types of chiropractic and physical therapy services, including: (i) chiropractic manipulation; (ii) mechanical traction; (iii) ultrasound therapy; (iv) therapeutic exercises; (v) neuromuscular reeducation; (vi) manual therapy; and (vii) electrical stimulation.

165.    In the claims for chiropractic and physical therapy services identified in Exhibit "1", the charges for chiropractic and physical therapy services were fraudulent in that they misrepresented New Medical's eligibility to collect PIP Benefits in the first instance.

166.    In fact, and as set forth herein, New Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of Florida law.

167.    What is more, in a legitimate clinical setting, the individual chiropractic and physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

168.    In keeping with the fact that the purported physical therapy and chiropractic services that were billed through New Medical were not medically necessary, Defendants did not tailor the chiropractic and physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

169.    There are a large number of individual types of physical therapy and chiropractic services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

170.    However, Defendants routinely purported to provide the same handful of chiropractic and physical therapy "treatments" to virtually every Insured in the claims identified in Exhibit "1", on substantially the same schedule, without regard for the Insureds' individual circumstances.

171.    Specifically, Defendants purported to provide Insureds in the claims identified in Exhibit "1" with two to five months of chiropractic and physical therapy services, consisting of chiropractic manipulation, mechanical traction, ultrasound therapy, therapeutic exercises, neuromuscular reeducation, manual therapy, and electrical stimulation. This, despite the fact that

the Insureds were differently situated, and could not possibly all have required a substantially identical course of chiropractic and physical therapy treatment.

### III. The Fraudulent and Unlawful Claims Defendants Submitted to GEICO

172. To support their fraudulent and unlawful charges, Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO through New Medical, containing thousands of individual charges, seeking payment for the Fraudulent Services for which Defendants were not entitled to receive payment.

173. The claims that Defendants submitted – or caused to be submitted – to GEICO were false and misleading in the following, material respects:

(i) The HCFA-1500 forms and treatment reports submitted – or caused to be submitted – by Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii) The HCFA-1500 forms and treatment reports submitted – or caused to be submitted – by Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, they were not.

(iii) The HCFA-1500 forms and treatment reports submitted – or caused to be submitted – by Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv) The HCFA-1500 forms and treatment reports submitted by and on behalf of Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

### IV. The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

174.   Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

175.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and have gone to great lengths to accomplish this accomplishment.

176.   For instance, Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and therefore were ineligible to collect PIP Benefits in the first instance.

177.   Defendants also knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently never were performed in the first instance.

178.   Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists, and unlawfully billed to GEICO.

179.   Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

180.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,350,000.00.

181.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against New Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

182.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-181, above.

183.    There is an actual case and controversy between GEICO and New Medical regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

184.    New Medical has no right to receive payment for any pending bills submitted to GEICO because New Medical operated in violation of Florida law.

185.    New Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

186.    New Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

187.    New Medical has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

188.    New Medical has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO, and because it misrepresented the identity of the persons who performed or directly supervised the Fraudulent Services.

189.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that New Medical has no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

190.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-181, above.

191.    New Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

192.    Zapata knowingly has conducted and/or participated, directly or indirectly, in the conduct of New Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that New Medical was not eligible to receive under the No-Fault Law because: (i) New Medical unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the

underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

193.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

194.    New Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated New Medical, inasmuch as New Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for New Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that New Medical continues to attempt collection on the fraudulent billing submitted through New Medical to the present day.

195.    New Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by New Medical in pursuit of inherently unlawful goals -- namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

196.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,350,000.00 pursuant to the fraudulent bills submitted through New Medical.

197.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Zapata and Verdecia**
**(Violation of RICO, 18 U.S.C. § 1962(d)**

198.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-181, above.

199.    New Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

200.    Zapata and Verdecia were employed by – or associated with – the New Medical enterprise.

201.    Zapata and Verdecia knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of New Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that New Medical was not eligible to receive under the No-Fault Law because: (i) New Medical was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-

determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

202.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

203.     Zapata and Verdecia knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

204.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,350,000.00 pursuant to the fraudulent bills submitted through the New Life enterprise.

205.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTH CAUSE OF ACTION**
**Against New Medical, Zapata, and Verdecia**
**(Under Fla. Stat. §§ 501.201 et seq.)**

206.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-181, above.

207.    New Medical, Zapata, and Verdecia are actively engaged in trade and commerce in the State of Florida.

208.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

209.    New Medical, Zapata, and Verdecia engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

210.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by New Medical, Zapata, and Verdecia were fraudulent in that they misrepresented: (i) New Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

211.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of New Medical, Zapata, and Verdecia has been materially injurious to GEICO and its Insureds.

212.    The conduct of New Medical, Zapata, and Verdecia was the actual and proximate cause of the damages sustained by GEICO.

213.    New Medical, Zapata, and Verdecia's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,350,000.00.

214.    By reason of New Medical, Zapata, and Verdecia's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against New Medical, Zapata, and Verdecia**
**(Common Law Fraud)**

215.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-181, above.

216.    New Medical, Zapata, and Verdecia intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through New Medical for the Fraudulent Services.

217.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that New Medical was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact New Medical was not in compliance with Florida law or eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

218.    New Medical, Zapata, and Verdecia intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through New Medical that were not reimbursable.

219.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $2,350,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by New Medical, Zapata, and Verdecia through New Medical.

220.    New Medical, Zapata, and Verdecia's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

221.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against New Medical, Zapata and Verdecia
### (Unjust Enrichment)

222.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-181, above.

223.    As set forth above, New Medical, Zapata, and Verdecia have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

224.    When GEICO paid the bills and charges submitted – or caused to be submitted – by New Medical, Zapata, and Verdecia through New Medical, it reasonably believed that it was legally obligated to make such payments based on New Medical, Zapata, and Verdecia's improper, unlawful, and/or unjust acts.

225.    New Medical, Zapata, and Verdecia have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that New Medical, Zapata, and Verdecia voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

226.     New Medical, Zapata, and Verdecia's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

227.     By reason of the above, New Medical, Zapata, and Verdecia have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,350,000.00.

## JURY DEMAND

228.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

a.     On the First Cause of Action Against New Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that New Medical has no right to receive payment for any pending bills submitted to GEICO;

b.     On the Second Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,350,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

c.     On the Third Cause of Action against Zapata and Verdecia, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,350,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. 1964(c), plus interest

d.     On the Fourth Cause of Action against New Medical, Zapata, and Verdecia, compensatory damages in an amount to be determined at trial but in excess of $2,350,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2);

e. On the Fifth Cause of Action against New Medical, Zapata, and Verdecia, compensatory damages in an amount to be determined at trial but in excess of $2,350,000.00, together with punitive damages, costs, and interest, along with such other further relief as this Court deems just, proper, and equitable; and

f. On the Sixth Cause of Action against New Medical, Zapata, and Verdecia, more than $2,350,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: January 22, 2026

*/s/ Max Gershenoff*
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
RIVKIN RADLER, LLP
Riverplace Tower
1301 Riverplace Blvd. Suite 1000
Jacksonville, FL 32207

-and-

926 RXR Plaza
West Tower
Uniondale, NY 11556
Phone: (904) 791-8948
Facsimile: (904) 598-6225
max.gershenoff@rivkin.com
john.marino@rivkin.com
lindsey.trowell@rivkin.com
kristen.wenger@rivkin.com
*Attorneys for Plaintiffs*